

Decided September 13, 1988

472

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

COMMONWEALTH TRIAL COURT

| | |
|---|---|
| DIANA C. FERREIRA, | CIVIL ACTION NO. 86-796 |
| Plaintiff, | |
| vs. | ORDER RE MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT |
| ROSALIA M. BORJA, et al., | |
| Defendants. | |

## STATEMENT OF THE CASE

On October 10, 1986, Plaintiff filed her complaint to quiet title in her favor regarding three (3) parcels of land identified as Lot Nos. 008 B 22, 008 B 23, and 008 B 24, in San Roque, Saipan.

On November 28, 1986, the Defendants filed their initial answer and on December 11, 1986, the Defendants filed their first amended answer denying that the Plaintiff owned the three (3) parcels of land and raising as affirmative defense the allegation that the acquisition of the land by Plaintiff was contrary to Article XII of the Constitution and was void ab initio.

On December 30, 1986, Plaintiff filed her motion for summary judgment and attached thereto the maps, deeds and documents tracing the history of the land transactions and ending in the acquisition of the three (3) lots by Plaintiff.

On February 20, 1987, Plaintiff filed a supplemental affidavit in support of her motion for summary judgment attaching thereto a transcription of the deposition of Isidora M. Salas, one of the Defendants, wherein the parties, through counsel, stipulated that the sole basis for Defendants' affirmative defense was Article XII of the Constitution.

On June 17, 1987, after the Court's approval, the Defendants filed their second amended answer which did three (3) things. First, it narrowed the issue. Second, it dropped unnecessary parties. Third, it added a counter-claim to quiet title in favor of the Defendants based on the Defendants' affirmative defense.

On March 31, 1988, Plaintiff and Defendant, Isabel M. Santos, severing herself from the other Defendants, filed a stipulation for and consent to entry of final judgment quieting title in favor of Plaintiff to Lots 008 B 22, 008 B 23, and 008 B 24. Defendant Isabel M. Santos received $250,000.00 from Nansay Micronesia, Inc. as consideration for a new deed executed by Isabel and her husband, in favor of Diana, for all three (3) lots on March 30, 1988.

On April 22, 1988, the Defendants Isidora and the heirs of Rosalia Mafnas Camacho, Deceased, filed their cross-motion for summary

474

judgment. By agreement of the parties, such motion is to also be considered by the Court as a response to Plaintiff's motion for summary judgment.

On May 13, 1988, after additional discoveries were taken, the Defendants filed a supplemental memorandum in support of their motion for summary judgment, entitled, "Second Supplemental Motion for Summary Judgment".

On May 20, 1988, Plaintiff filed her response to Defendants' motion for summary judgement.

On June 6, 1988, the Defendants filed their reply to Plaintiff's response.

On August 12, 1988, Plaintiff filed her memorandum in response to Defendants' second supplemental motion for summary judgment of May 20, 1988.

On August 17, 1988, Defendants filed their reply to Plaintiff's memorandum in response to Defendants' second supplemental motion for summary judgment.

All of the above filings were agreed to by the parties and consented to by the Court. Each side was given ample opportunity to exhaust all desired discovery and present its case completely.

The parties, through counsel, appeared before this Court and presented oral arguments on August 26, 1988 after which the Court took the matter under advisement.

## STATEMENT OF THE FACTS

The material facts of this case historically commenced with a partnership agreement entered into on October 21, 1980 between Frank F. Ferreira and Diana C. Ferreira, Husband and Wife, identified as "F & D" and James H. Grizzard and Barbara F. Grizzard, Husband and Wife, identified as "J & B" in the partnership agreement.

By its own terms, the purpose of the agreement was to form a business for the development and sale or lease of a parcel of land described as Lot 008 B 10, containing an area of 7,198 square meters situated in San Roque, Saipan. The partnership agreement was to have a duration of one (1) year.

Article 4 of the partnership agreement states as follows:

> Partner Diana C. Ferreira, as a citizen of Northern Mariana (sic) descent will purchase the property described as that part of Lot 008 B 10, and more particularly described in this agreement, with the $41,000.00 contributed by partners "J & B". (Emphasized)

The agreement contemplated subdividing and developing the land for sale or lease. At the outset, the partners were to be paid their initial investment in the partnership and thereafter each set of partners would receive 50% of the profit. Article 5 of the agreement states as follows:

> As each separate lot is developed for sale or lease and a willing buyer or lessee is obtained therefor, the partnership will execute a quitclaim deed or other proper form of conveyance of the sold or leased lots to partner Diana C. Ferreira for purpose of her granting a warranty deed or lease to the new buyer or lessee. (Emphasized)

**476**

In the event the sale, lease or development of the first two (2) lots is sufficient to generate enough income to pay the partners, the amount of their initial capital investment, the remaining three (3) lots will be disposed of as follows: "J & B" will quitclaim all of their right, title and interest in one lot to partners "F & D". "F & D" will quitclaim all their right, title and interest in one lot to "J & B,.... (Emphasized)

In the event partner Diana C. Ferreira desires to withdraw from the partnership for any reason, she hereby agrees to assign all her right, title and interest to the real property to a person of Northern Mariana descent who will be designated by the partners and selected as a new partner.

The partnership agreement was executed by all four (4) partners. At his deposition taken on February 16, 1987, Mr. Grizzard testified to the following facts regarding the partnership agreement.

1. That he and his wife were parties to the partnership agreement and they contributed $41,000.00 to the partnership. (Pages 2 and 3)

2. Diana's role in the partnership was to take title to the property in her name as a Commonwealth citizen and her interest was whatever she and her husband determined. (page 3)

3. The land was purchased with the $41,000.00 and title taken in the name of Diana. (page 3)

4. That he and his wife are not persons of Northern Marianas descent. (page 7)

5. That he contributed roughly $100,000.00 for the purchase of all the land. Included in the $100,000.00 is the $41,000.00 paid under the partnership agreement. The money was given by him to Frank Ferreira. (Pages 18 and 19)

477

6.  Even today, he and his wife will receive a percentage of the sale or lease price of any development. Even though the partnership agreement has expired of its own terms, they have a verbal agreement regarding the sale or lease of the property. (Page 22)

At her deposition taken on January 15, 1987, Diana C. Ferreira testified to the following facts regarding the partnership agreement.

1.  She had no idea what the purpose of the partnership was and her husband was the one handling all the details. (Page 141)

2.  She did not know if the land involved in the partnership agreement was involved in this lawsuit. (Page 141)

3.  She did not know what the nature of the partnership was and did not have an understanding of what a partnership was. (Pages 143 and 145)

4.  She did not know what she was supposed to do with the land once she purchased it with the $41,000.00. (Page 150)

After the partnership agreement was entered into, the partners succeeded in purchasing three (3) parcels of land, all adjacent to each other, belonging to the three (3) sisters, Isabel Mafnas Santos, Isidora Mafnas Salas, and Rosalia Mafnas Borja. All three parcels were placed in the name of Diana C. Ferreira as the purchaser.

On October 22, 1980 (one day after the partnership agreement was signed), part of Lot No. 008 B 10, containing 7,108 square meters, was purchased from Isabel M. Santos for the sum of $20,000.00 (not $41,000.00).

**478**

On December 8, 1983, Lot No 008 B 10 (now 008 B 20) containing 7,024 square meters was purchased from Isidora Mafnas Salas for the sum of $33,620.00.

Between December 17, 1982 and September 4, 1984, through an option agreement and a series of 4 deeds, Lot No. 008 B 23, containing roughly 7,166 square meters, was purchased from Rosalia Mafnas Borja, and others who previously purchased from her, but the amount actually received by Rosalia or paid by the Ferreiras and the Grizzards is unclear. Whatever the amount is, it is not more than $50,000.00 and it is not a material fact for purposes of the motion and cross-motion for summary judgment herein.

In her deposition taken on January 15, 1987, Diana C. Ferreira testified regarding the above land transactions as follows:

1. That she could not recall anything because her husband was the one taking care of all the business transactions. (Pages 18 and 19)

2. That she did not remember how much Isabel Santos was paid because it was her husband who had all the checks. (Page 23)

3. That she had no idea where the $20,000.00 came from that was paid to Isabel Santos for her land. (Page 27)

4. During her deposition, it was stipulated between Plaintiff and Defendants, through counsel, that all checks used to buy the land were drawn on Frank Ferreira's bank account with his name on them and signed by him alone. (Page 35)

5. That she could not read maps. (Pages 67 and 81)

6. That she did not know whether the $9,496.00 was paid to Rosalia M. Borja as consideration for the deed, attached as Exhibit #15, to her motion for summary judgment. (page 76)

7. That she purchased the land in Exhibit #15 for her children and family. Her husband paid the price for the land. (Page 79)

8. That she plans to hold on to the land for her children, Vera and Clint. (Page 80)

9. In response to a question regarding Frank Ferreira's check no. 146, she stated, "I cannot tell you anything. My ... my husband is the one who is handling everything. He knows everything." (Page 119)

10. That she had no authority to draw a check from her husband's account and she had her own account. (page 166)

11. That her husband has had a lot of experience in land transactions and she has had no experience in land transaction. When they bought property, her husband took care of everything. (Page 173)

12. That in all the land transactions involving the three (3) parcels, her husband handled the whole transactions from start to finish. (Page 186)

13. Her husband controlled all the land transactions and the money involved therein. (pages 188 and 189)

**480**

In his deposition taken on January 23, 1987, Frank F. Ferreira Jr., testified to the following:

1. The Grizzards contributed maybe $50,000.00 to the land transactions in addition to the $41,000.00 paid under the partnership agreement. (Page 170)

2. He has been involved in real estate business for 7 to 8 years. (Page 194)

On September 5, 1986, the parties to the partnership agreement (except Barbara Grizzard) entered into an agreement to lease real property with Sen International Pacific Corporation. In that agreement, the partners called themselves "Owners and Lessees" of Lots 008 B 22, 23 and 24.

Under the terms of that agreement, Frank Ferreira, Diana Ferreira and James Grizzard (in that order) agreed to lease all three (3) parcels for a period of 55 years, for the lease price of $1,342,415.00. The agreement specifically states that Frank Ferreira and Diana Ferreira (in that order) will receive $672,415.00, and James Grizzard will receive $670,000.00. The agreement was filed with the Commonwealth Recorder on November 5, 1986.

Prior to recording the agreement, the Lessors learned that Title Insurance could not be obtained, as required by Paragraph 11.2 of the agreement, unless title was quieted in Diana C. Ferreira by the court. Therefore, on October 10, 1986, this action was filed.

Contrary to Plaintiff's deposition testimony that she was going to hold on to the land for her children Vera and Clint, on January 18, 1988, Diana C. Ferreira entered into two (2) major contracts regarding the

**481**

three (3) parcels of land. The first was an agreement to lease for 55 years and the second was an outright sale of all the land.

In the agreement to lease, Diana agreed to lease all three (3) parcels to Nansay Micronesia, Inc. for a period of 55 years for a lease price of $5,940,000.00 less certain costs. The closing date was to be 30 days thereafter or when Civil Action No. 86-796 (this case) was disposed of or settled in Plaintiff's favor. The agreement was executed by Diana and Frank Ferreira. Mr. Ferreira's signature was expressedly stated to be for the purpose of approving and consenting to the agreement.

In the contract for sale of real property, Diana agreed to sell all three (3) parcels of land to Ana Deleon Guerrero Little for the sum of $60,000.00. Such sale was contingent upon Diana entering into the 55 year lease with Nansay Micronesia, Inc. The sales contract was executed by Diana and Frank Ferreira. Mr. Ferreira's signature was expressedly stated to be for the purpose of approving and consenting to the sale. The $60,000.00 purchase money was to be paid by Nansay Micronesia, Inc. on behalf of Ana Little.

As of March 25, 1988, Civil Action No. 86-796 had not been disposed of or settled completely in Plaintiff's favor. On that date, March 25, 1988, Diana entered into a new agreement to lease the property to Nansay Micronesia, Inc. under basically the same terms and conditions as the January agreement to lease, except that the costs, commissions, attorney's fees, and the settlement costs with Defendants and the Grizzards were separated. The same agreement was approved and consented to by Frank Ferreira.

On the same date, March 25, 1988, James and Barbara Grizzard quitclaimed to Nansay Micronesia, Inc. all their rights, title and interest in the three (3) parcels of land for a consideration of $1,100,000.00. The quitclaim deed states that the Grizzards, "... do hereby remise, release and forever quitclaim unto Nansay Micronesia, Inc. (Nansay) ... all their rights, title, interests and estate, including any lien, leasehold or other short-term interest as permitted by law, legal and equitable, now owned or hereafter acquired, ..."

The basis of the Grizzards claim of right, title and interest is the partnership agreement dated October 21, 1980. The deed went on to state that the Grizzards shall withdraw from such partnership and assign all their rights thereunder to Nansay. In consideration thereof, the Grizzards received, on the same day, two (2) checks from Nansay, totalling $1,100,000.00.

In his deposition taken on May 3, 1988, Mr. Grizzard testified that the partnership agreement entered into in 1980 continued in force on down to the time when he and his wife executed the document entitled, "Quitclaim, Release of Claims, and Assignment" on March 25, 1988.

Frank Ferreira, Jr., has put together other land transactions quite similar to the one involved in this case. One in which he testified to involved Frank Ferreira, Jr., (Real Estate Broker/Developer), Donald R. Buffton (a known Real Estate Surveyor), Chuck Greer, and Diana C. Ferreira, designating themselves as sellers; and David M. Sablan as Purchaser for purposes of leasing to Joel Bergsma and Mary Beth Herald (attorneys) who paid for and ended up with the property. The land title

483

was transferred between Diana C. Ferreira and David M. Sablan, the only persons of Northern Marianas descent in the group who appeared to be acting as land title holders.

The persons involved in *the land transactions in this case and* their status under the Constitution are as follows:

1. Isidora, Isabel and Rosalia are three sisters who inherited the three (3) parcels of land from their deceased father. They are persons of Northern Marianas descent (Chamorro) who give the impression that they are not sophisticated real estate dealers.

2. Diana C. Ferreira is a person of Northern Marianas descent (Chamorro) married to Frank Ferreira. She testified to her lack of experience in business and land transactions and stated on Page 68 of her deposition of January 15, 1987, "... I have no idea what's going on."

3. Frank F. Ferreira, Jr. is originally from Hawaii who came to Saipan and married Diana. He is a businessman, land developer, and for 7 to 8 years prior to his deposition in early 1987, was a real estate broker. He is not a person of Northern Marianas descent.

4. James H. Grizzard came to Saipan from California as a Public Defender and later went into private practice of law. He is an attorney at law married to Barbara Grizzard and is not a person of Northern Marianas descent.

484

5. Barbara Grizzard came to Saipan with her husband, James, and is not a person of Northern Marianas descent.

6. Sen International Pacific Corporation is owned by persons other than those listed above. It is not eligible to own land in the Northern Marianas under the Constitution.

7. Nansay Micronesia, Inc. is owned by persons who are not of Northern Marianas descent and is not eligible to own land under the Constitution.

8. Ed Yokeno is an officer and director of Nansay Micronesia, Inc. who is not a person of Northern Marianas descent and who acts on behalf of Nansay in negotiating the land transactions as set forth above.

9. Ana DLG Little is a close friend of Ed Yokeno, a person of Northern Marianas descent, who is married to Jack Little, the man who introduced Ed Yokeno to the Ferreiras.

The facts as set forth above are undisputed. The facts pertaining to land transactions and agreements are contained in documents provided by plaintiff or her attorneys or other deponents associated with plaintiff. Such documents are all attached as exhibits to one or more of the depositions. Material facts established by deposition testimony were given by plaintiff and other deponents associated with plaintiff. Such facts have not been disputed by the Defendants either by Affidavit or other means.

There being no genuine issue of any material fact in dispute and there being only a legal or constitutional issue to be entertained, this case presents no need for a trial and it is ripe for summary judgment disposition.

485

## STATEMENT OF THE ISSUE

By virtue of the pleadings and the stipulation of the parties, there is only one issue before the Court. The issue is: WHETHER THE ACQUISITIONS OF THE THREE (3) PARCELS OF LAND FROM ISABEL, ISIDORA, AND ROSALIA, BY DIANA FERREIRA, FOR HERSELF (AS LONG AS SHE REMAINED A PARTNER) AND HER PARTNERS, FRANK, JAMES AND BARBARA, PERSONS NOT OF NORTHERN MARIANAS DESCENT, USING THEIR COMBINED MONEY, FOR PURPOSES OF REAL ESTATE DEVELOPMENT BUSINESS AND JOINT FUTURE PROFIT, VIOLATED ARTICLE XII OF THE CONSTITUTION.

The parties have agreed that the Defendants do not challenge the validity of any of the deeds leading up the acquisition of the three (3) land by Diana. But for the affirmative defense of Article XII violation, Plaintiff is entitled to judgment as a matter of law. The Defendants are entitled to judgment as a matter of law if the Court concludes that the acquisition of the three (3) lots by Diana violated the Constitution.

## CONTENTIONS OF THE PARTIES

Defendants contend that the acquisition of the three (3) parcels of land by Diana violated the Constitution for the following reasons:

1. Diana was not acting for herself or on her own behalf. She was acting on behalf of Frank Ferreira, James and Barbara Grizzard in acquiring the three (3) land for the three of them. She acted as their agent/trustee and it was they who acquired the land in reality and equitably. Since Frank, James and Barbara are not persons of Northern Marianas descent, their acquisition of the land through Diana violated the Constitution. Frank, James, and Barbara, cannot do through Diana, as

**486**

their agent/trustee, that which they themselves cannot do directly.

2.    Diana's role as agent/trustee and the land title that she acquired were not absolute or permanent.  If, for whatever reason, she decided to withdraw as a partner, her role as title holder and her right, title and interest in the land she acquired would be terminated by Frank, James and Barbara and transferred to another person of Northern Marianas descent to be designated by Frank, James and Barbara.    Therefore, the absolute and permanent power over the acquired land rest with Frank, James and Barbara in violation of the Constitution.

3.    The money used to buy the land was provided by Frank, James and Barbara.  Defendants content that it is elementary law and logic that the person who provides the money owns what the money buys.  The method of acquisition through Diana, as agent/trustee, is one of the methods of acquisition envisioned by the framers of the Constitution when they defined "acquisition" to include "...acquisition by sale, lease, gift, inheritance or other means."  (Emphasized)    Such method of acquisition is restricted to persons of Northern Marianas descent.

4.    Since the acquisition of the three (3) parcels of land by Diana for Frank, James and Barbara was contrary to Section 1, Article XII of the Constitution, such acquisition was void ab initio under Section 6 thereof, and the land never transferred out of the hands of Isabel, Isidora and Rosalia.

Plaintiff contends that her acquisition of the three (3) parcels of land was valid and constitutional and that the defendants are merely

**487**

attempting to set aside such conveyances in order to reap the financial benefit of changed market conditions. She contends that her acquisition of the three (3) parcels of land was valid and constitutional for the following reasons:

1. Diana is a person of Northern Marianas descent and has every constitutional right to purchase and acquire fee simple interest in the three (3) parcels of land involved herein. If she had any agreement to purchase the land for Frank, James an Barbara, such agreement would have been unconstitutional and void and therefore, could never have existed. Therefore, no alleged agent/trustee relationship could have existed between she and Frank, James and Barbara, and she owns the three (3) parcels of land completely, without there being any equitable interest in the land in anyone else.

2. Frank, James and Barbara are not persons of Northern Marianas descent. They cannot acquire any long term interest in land in the CNMI, whether such interest be legal, equitable or otherwise. Therefore, under common law and the Constitution, Frank, James and Barbara could not and did not acquire any equitable long-term interest in the three (3) parcels of land acquired by Diana. Any attempt on their part to have acquired such equitable interest would have been void ab initio and the land, therefore, rested completely and exclusively in the ownership of Diana.

**488**

3. Diana's reliance on her husband's business advice and assistance cannot render her acquisition of the land unconstitutional. The Constitution recognizes conjugal efforts and allows spouses of Northern Marianas descent to acquire land through inheritance. Diana was not used by her husband, but she used her husband's business and real estate expertise to enhance their family well being. Diana is in control of the land she acquired and proceeds therefrom. She accepts some and rejects some of her husband's advice. Therefore, she's not a puppet and does not merely hold title for Frank, James and Barbara.

4. It would be contrary to economic and public policy for the court to declare the land acquisition herein as unconstitutional on the basis of the 1980 partnership agreement and the purchase money having been provided by persons not of Northern Marianas descent. It would render real property titles uncertain, reduce the value of all property, and the people will be unable to reap the economic benefits of their land.

## DISCUSSION

This is not a case where a person, not of Northern Marianas descent (Frank Ferreira), marries a Chamorro woman (Diana C. Ferreira) and together they buy land for their family use or family investment in real estate. Such case is not before this court and will not be decided herein.

489

The case that is before this Court is one in which a real estate broker (Frank Ferreira), who is not of Northern Marianas descent, teams up with a non-Northern Marianas descent lawyer (James Grizzard), and together they create sophisticated land deals for purposes of buying, developing and selling or leasing real estate for joint future profit. In that process a partnership is formed (including their wives, Diana Ferreira and Barbara Grizzard, as partners) designating Diana, because of her status, to hold title to the land for the partnership, only as long as she remains a partner. If for any reason, Diana decides to withdraw as a partner, then all her rights, title and interest in the land will terminate and be transferred to another person of Northern Marianas descent to be designated by Frank, James and Barbara, without any further consideration.

It is important for this Court to decide whether the partnership agreement of 1980 terminated a year later in 1981 and ended the relationship between the partners thereunder. Plaintiff contends that it did and Defendants contend that it did not.

Upon review of the facts and the actions of the partners, the Court concludes that the partners continued to relate to each other as partners and lived by the terms of that agreement until the Grizzards quitclaimed all their rights, title and interest in Lots 008 B 22, 23 and 24 to Nansay Micronesia, Inc. and assigned their rights under the partnership agreement to Nansay, in March, 1988.

When all three (3) lots were to be leased to Sen International Pacific Corporation in September, 1986, Mr. Grizzard joined with the Ferreiras as "Owners" and "Lessors". The Ferreiras were to receive

$672,415.00 and Mr. Grizzard was to receive $670,00.00 under that lease agreement. The arrangement in that lease agreement is consistent with the understanding, on the part of the partners, that the partnership agreement was still good.

On March 25, 1988, Mr. and Mrs. Grizzard quitclaimed to Nansay all their rights, title and interests in Lots 008 B 22, 23 and 24 and simultaneously assigned all their rights under the partnership agreement to Nansay. The quitclaiming of land to Nansay was done even though Nansay is not eligible to receive fee simple interest in land in the CNMI. Such quitclaiming of land and assignment of partnership rights are strong expressions of the validity and strength of the partnership agreement up to that time.

In addition, Mr. Grizzard testified in two separate depositions that he and his wife's partnership arrangements continued to March, 1988.

It is important for this Court to decide whether the Grizzards contributed money only for the purchase of the one lot from Isabel Santos or whether they also contributed money for the purchase of the two (2) lots from Isidora and Rosalia. Plaintiff contends that the Grizzards contributed only to the purchase of one lot and Defendants contend that they contributed to the purchase of all three (3) lots.

Based on the facts and the actions of the partners, this Court concludes that the Grizzards contributed money to the purchase of all three (3) lots.

Starting with the partnership agreement and the purchase of the first lot, the Grizzards contributed $41,000.00 but the first lot was purchased for only $20,000.00. Both Mr. Grizzard and Mr. Ferreira testified in depositions that the Grizzards contributed at least $50,000.00 more than the $41,000.00 initially paid to the partnership as capital.

When the three (3) lots were to be leased to Sen International Pacific Corporation, Mr. Grizzard joined in as "Lessor" and "Owner" of <u>all three (3) lots</u>, not just the lot purchased from Isabel Santos. The partition of the Lease money was to be very close to .50/.50 instead of .33/.66.

When Nansay was to replace the Grizzards under the partnership agreement, the Grizzards quitclaimed <u>all three (3) lots</u>, instead of just one. This is consistent with the fact that the Grizzards contributed money for the purchase of all three (3) parcels of land. What the exact amount of that contribution is as to each lot is not a material fact. It is the fact they they contributed that is material.

It is important for this Court to decide whether Frank, James and Barbara deemed themselves as owners of the land acquired by Diana so as to exercise ownership rights and control over the land. Plaintiff contends that they did not, and defendants contend that they did.

Based on the facts of this case and the actions of Frank, James and Barbara, this Court concludes that they did.

492

Starting with the partnership agreement of 1980, Frank, James and Barbara had the absolute power thereunder to divest Diana of any right, title or interest in the land if, for any reason, Diana decided to withdraw as a partner. In that event, Frank, James and Barbara would designate a new person of Northern Marianas descent to hold title for them.

The agreement provides that as each lot is developed, the partnership (Frank, James and Barbara) will quitclaim that lot to Diana, so that Diana can grant a deed to a purchaser and so forth. It also provides for the Ferreiras (together) to quitclaim to the Grizzards and vice versa certain lots after each couple had recouped its capital investment. Here in the CNMI a quitclaim deed is used when conveying fee simple interest in land, without warranty of title.

When the land was to be leased to Sen International Pacific Corp., Frank and James identified themselves as "Lessors" who were "owners and lessees". Again, in the CNMI, a "Lessor" is the owner of the land. If Diana was the only owner of the land at that time, then Mr. Grizzard would not have received almost 50% of the lease price.

When the Grizzards were paid $1,100,000.00 by Nansay, they quitclaimed all three (3) lots to Nansay. If they did not think they owned the land, then they would have thought that they had nothing to quitclaim. It is noted that the Grizzards' deed expressly stated that their claim of interest was doubtful. However, that did not negate the fact that they had a claim of interest and title. And if they did not have any claim on the land, then they would not have been paid $1,100,000.00.

When Diana was to lease the three (3) lots to Nansay for 55 years and sell the same three (3) lots to Ana Little outright, Frank Ferreira had to sign the agreements, _approving_ and _consenting_ thereto. In other words, before Diana could lease or sell what was supposedly her own land, she had to get the permission of Mr. Ferreira. These facts lead to the conclusion that Frank, James and Barbara exercised absolute control and ownership rights over the land.

In examining the depositions of Diana and Frank Ferreira, one cannot escape the fact that Diana exercised minimum, if any, control over the land in question, and it has been Frank who exercised most, if not complete, control over all the circumstances surrounding land transactions and ownership.

The Constitution restricts the acquisition of permanent and long-term interests in real property to persons of Northern Marianas descent. (Article XII, §1) Permanent and long-term includes freehold interests (Art. XII, §3) Freehold interests includes legal and equitable interests. (See Briefing papers for the Constitutional Convention, Vol. II, pg. 19) Acquisition includes acquisition by sale, lease, gift, inheritance or other means. (Art. XII, §2)

The definition of "acquisition" as proposed to the Constitutional Convention by its Standing Committee on Personal Rights and Natural Resources is _slightly different from that finally contained in the Constitution_. A look at the difference may shed light on what the committee which drafted Article XII intended to cover under the term "acquisition". The Committee's proposed definition states: "... acquisition ... _shall_ include acquisition _by means of all transfers_ by sale,

**494**

lease, gift, inheritance or <u>any</u> other means...." (the underlined words and phrases are not in the Constitution). (Journal of the Constitutional Convention, Vol. II, pg. 576)

The framers of the Constitution were not naive. They knew that someone would try to figure out a way to acquire land despite the Constitutional restrictions. That is the reason for including the term "acquisition by any other means" in the Constitution.

There were two main reasons given by the framers of the Constitution for the restriction on land alienation. The first is to protect the indigenous people from losing their land, and second, to protect the indigenous people from unfair competition with and exploitation by sophisticated and experienced outsiders in real estate transactions.

In its report to the Convention, the Committee that drafted Article XII of the Constitution stated:

> The committee believes that restrictions on the alienation of land are necessary ... because the social and economic benefits that are to be derived from land ownership are unique and cannot be duplicated in any way. The Commonwealth to be created by this Constitution will be very small. It will have only a few hundred square miles of land.... Although the population may grow in the future, the available land cannot increase. Land is one of the principal sources of social stability. It gives root to the pride, confidence and identity as a people that will permit the cooperative action necessary to a successful Commonwealth. <u>If it passes out of the hands of the people of the Northern Mariana Islands, those unique social and economic benefits will be lost</u>. (Emphasized)

> ....From the end of World War II to the present, the law enforced in the Northern Mariana Islands has forbidden alienation of land to persons not citizens of the Trust

Territory of the Pacific Islands. The people of the Northern Mariana Islands have had little opportunity to gain experience in land transactions of the kind that would be necessary to compete effectively against investors from the well-developed economies of other countries. (Journal of the Constitutional Convention, Vol. II, pg. 560-561) (Emphasized).

The concerns raised by the Committee on Personal Rights and Natural Resources as quoted above are consistent with the concerns of the people who drafted the Covenant to Establish the Commonwealth. The Section by Section Analysis of Section 805 of the Covenant states in part:

This Section expressly recognizes the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands and the desirability of protecting them against exploitation and promoting their economic advancement and self-sufficiency. (Analysis of the Covenant, pg. 116) (Emphasized)

The actions of Frank Ferreira and the Grizzards in acquiring the land involved herein, through Diana, and the results of those actions are precisely the things that the framers of the Constitution intended to prohibit and prevent.

Frank Ferreira and James Grizzard are educated, experienced, sophisticated and assertive businessmen, land dealer and lawyer. They are not eligible to own land but managed to acquire three (3) parcels of land for less than $50,000.00 each. Mr. Grizzard has realized $1.1 million dollars and Mr. Ferreira has put together a deal with Nansay that would realize millions of dollars. The three (3) Mafnas sisters are permanently out of their family land and the land would have ended up in the hands of outsiders, but for the filing of this case, the name of

496

Diana Ferreira was used as a camouflage to hide the unconstitutionality of the acquisition of the land.

If the land acquisition as occurred in this case and the circumstances under which it occurred were to be deemed constitutional and permissible under Article XII, then the people of the Northern Mariana Islands might as well declare Article XII of their Constitution, null and void ab initio, or as an islander would say, dump it over the reef.

Plaintiff's argument that any agreement for her to buy the land for Frank, James and Barbara would have been unconstitutional and void, therefore, such agreement never could or did exist and the land vested in her as the buyer, attempts to ignore the expressed mandate of the Constitution. Under §6 of Article XII, the result of an unconstitutional transaction is not that the land vests in the name of the buyer, whose name is used merely as a camouflage to give the appearance of constitutionality. Instead, Section 6 declares the transaction void ab initio.

The same principal and analysis apply to the argument that since Frank, James and Barbara could not constitutionally buy land, therefore, any attempt by them to have bought the land would have been void, never existed, and the land ended up with Diana and they could not and did not acquire even an equitable interest in the land.

Essentially Plaintiff is arguing that since the Constitution prohibits Frank, James and Barbara from buying land, therefore, they cannot physically do so. It is similar to arguing that since it is illegal to buy marijuana, therefore, it is physically impossible to do so.

**497**

Such illogical argument is directly refuted by the very action of the parties to land transactions in this case. Nansay Micronesia, Inc. (not eligible to buy land in the CNMI) paid the Grizzards (persons not of Northern Marianas descent) 1.1 million dollars in exchange for a quitclaim deed transferring their interests, rights and title to the land in question. Although such transaction is double unconstitutional, it did happen.

Finally, this argument has been addressed by the Appellate Court in Wabol v. Muna, 2 C.R. 231 (C.T.C. 1985) 2 C.R. 963, (N.M.D.C. App. Div. 1987) which this court must follow. In the Wabol case, the Trial Court decided that the Lessee could not constitutionally acquire more than 40 years of leasehold interest. Therefore, although Lessee attempted to get more than 40 years, the Trial Court held that the lease was constitutional, but only for 40 years.

The Appellate Court reversed on that point and held that the Lease for more than 40 years violated Article XII of the Constitution. Therefore, the entire lease was void ab initio and no lease ever existed from the beginning. The Appellate Court did not accept the proposition that since the Lessee could not have constitutionally acquired leasehold interest for more than 40 years, therefore, no lease for over 40 years could or did exist and the lessee ended up with only a 40 year lease.

Plaintiff's argument that Diana's reliance upon her husband for business advice and assistance did not render her acquisition of the land as unconstitutional is out of place. The facts do not support such set of circumstances and such argument. This is not a case where Diana

**498**

wanted to buy land and went to her husband for advice. This case is the opposite of that. Frank wanted to buy land and went to his wife for the use of her name. In addressing this subject matter, the Committee of the Convention made a report to the Convention that says, "Spouses who are <u>not</u> persons of Northern Marianas descent are <u>not</u> qualified to acquire land by sale, lease, gift or other means." (Journal of the Constitutional Convention, Vol. II, pg. 564)

Plaintiff's suggestion that a declaration that the land acquisition in this case is unconstitutional would have serious negative economic impact may be true. However, this Court will not defy the mandate of the Constitution and the intent of its framers. With respect to this issue, the Committee that drafted Article XII made a report to the Convention as follows:

> Restrictions on land alienation are necessary to preserve the character and strength of the communities that make up the Commonwealth. The people of the commonwealth are <u>willing to sacrifice</u> the short-term economic gain that might be achieved by putting their land on the market in order to achieve the longer-term economic and social gain that will come from preserving their family and social order, thus protecting the basis for enduring economic growth. The people are willing to take the time to learn how best to use their land. There are at present no complete land use plans and no comprehensive zoning regulations. (Journal of the Constitutional Convention, Vol. II, pg. 562)

The truth about the lack of land use plans and zoning laws when the Constitution was drafted is still true today.

The Defendant, Isabel M. Santos, has severed herself from the other defendants and has stipulated to have title to the land quieted in

Plaintiff's favor.    She has also executed another deed transferring all her interests in the land to Diana C. Ferreira, Plaintiff.    This is done under an agreement between Diana and Nansay Micronesia, Inc., that Nansay will pay Isabel $200,000.00 plus pay her attorneys fees of $50,000.00, for Diana to settle the case and receive the deed from Isabel.    In other words, now Diana is not acting for and on behalf of Frank, James and Barbara, but she is acting for and on behalf of Nansay, another person (corporation) not of Northern Marianas descent.    Such transaction is also contrary to the Constitution.    Not only did Nansay reserve its power to divest Diana of her right, title and interest in the property, but it actually exercised such power.    In January and March, 1988, Nansay caused Diana to transfer the entire land to Ana DLG. Little for the sum of $60,000.00, which money came from Nansay or Ed Yokeno.    Mr. Yokeno decided to place the land title in the person of Northern Marianas descent of his choice.

Upon consideration of the undisputed material facts of this case and the discussion above,

**IT IS HEREBY ORDERED THAT:**

1.    The acquisition of the three (3) parcels of land (008 B 22, 23 and 24) by Diana C. Ferreira from Isabel, Isidora and Rosalia violated Article XII, Section 1 of the Constitution and is void ab initio under Section 6 thereof.

2. The acquisition of the same land by Diana from Isabel Santos as part of the stipulated settlement is also unconstitutional and void ab initio. The stipulated settlement quieting title in Diana is also unconstitutional and any judgment entered by this Court pursuant thereto will also be unconstitutional and void.

3. The three (3) parcels of land never left the hands of Isabel, Isidora and Rosalia (or any person who legally bought from Rosalia and then sold to Diana) and the same persons are currently the owners of the land.

4. The issues related to money paid for the land or restitution, etc., have not been presented to the Court and cannot be addressed in this Order.

5. Plaintiff's Motion for Summary Judgment is hereby **DENIED**.

6. Defendants' Motion for Summary Judgment is hereby **GRANTED**.

Dated this _13ᵗʰ_ day of _September_, 1988.

RAMON G. VILLAGOMEZ
JUDGE